**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO**

**EASTERN DIVISION, YOUNGSTOWN**

| | | |
|---|---|---|
| **Patricia Almasy, Nina Aquino, Raeann Bankston, Holly Carroll, Alice M. Craft, Todd Craft, Kristine Croston, Robert Delposen, Glenn Dixon, John Dryfuse, Brad Edwards, Olivia Foster, Oscar Gaunt, Karen Gilmore, Sarah Ann Graham, Debra Lee Gray, Dylan Hall, Randy Hogue, Elijah D. Holloway, Tammie Howarth, Laryssa Jackson, Nicole Jamison, James Jones, Patricia L. Kasserman, Timothy Lambright, Matt Liberty, Christopher Lucas, Linda McLaughlin, Nathan Minerd, Albert L. Nahar II, Diana Nizer, Sheena Nolan, Patrick Palmer, Rocco Anthony Pietz, Ronald Prokop, Mark Richard, Ronald Roach, Donald Simmons, Penny Singleton, and Charles W. Will** | : | **CASE NO.** |
| | : | **JURY TRIAL DEMANDED** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **Norfolk Southern Corporation, Norfolk Southern Railway Company, Oxy Vinyls, LP, GATX Corporation, General American Marks Company, Trinity Industries Leasing Company** | : | |
| | : | |
| | : | |
| **Defendants** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## COMPLAINT AND JURY DEMAND

Plaintiffs, Patricia Almasy, Nina Aquino, Raeann Bankston, Holly Carroll, Alice M. Craft, Todd Craft, Kristine Croston, Robert Delposen, Glenn Dixon, John Dryfuse, Brad Edwards, Olivia Foster, Oscar Gaunt, Karen Gilmore, Sarah Ann Graham, Debra Lee Gray, Dylan Hall, Randy Hogue, Elijah D. Holloway, Tammie Howarth, Laryssa Jackson, Nicole Jamison, James Jones, Patricia L. Kasserman, Timothy Lambright, Matt Liberty, Christopher Lucas, Linda McLaughlin, Nathan Minerd, Albert L. Nahar II, Diana Nizer, Sheena Nolan, Patrick Palmer, Rocco Anthony Pietz, Ronald Prokop, Mark Richard, Ronald Roach, Donald Simmons, Penny Singleton, and Charles W. Will (collectively "Plaintiffs"), sue Defendants Norfolk Southern Corporation ("NSC"), Norfolk Southern Railway Company ("NSRC"), (collectively "Railroad Defendants"); Oxy Vinyls LP, GATX Corporation, General American Marks Company, and Trinity Industries Leasing Company (collectively, "Railcar Defendants"), and based on personal knowledge, investigation of counsel and review of public documents and information, allege as follows:

## INTRODUCTION

This Complaint seeks redress for residents, property owners, and employees, working and/or located in and around the February 3, 2023 Norfolk Southern Freight Train 32N derailment and subsequent "controlled" release in East Palestine, Ohio (the "Derailment Site")[1], that resulted in contamination of, and exposure to, massive amounts of vinyl chloride, dioxins, and other toxic chemicals—including butyl acrylate, benzene, ethylene glycol monobutyl ether, ethylhexyl acrylate, isobutylene, volatile and semi-volatile byproduct compounds and other combustible materials. As a result of this derailment and NSC and NSRC's actions afterwards to conduct a "controlled" release and burn, Plaintiffs have all suffered, among other things, loss of use and enjoyment of property, property damage, exposure to toxic material, inconvenience, disruption, and economic damages as alleged more specifically below.[2]

---

[1]The Derailment Site is in East Palestine, Columbiana County, Ohio at Latitude: 40.8360395°N; Longitude 80.5222838°W.

[2]These events are herein referred to as the train derailment and resulting toxic chemical explosion.

## THE PARTIES

### *Plaintiffs*

1.      At all relevant times, Plaintiff Patricia Almasy was an adult citizen of Ohio and the resident-owner of the real property located at 1719 McColusky Road, Columbiana, Ohio 44408.

2.      As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Almasy has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

3.      At all relevant times, Plaintiff Nina Aquino was an adult citizen of Pennsylvania residing at 839 Mercer Road, Beaver Falls, Pennsylvania 15010.

4.      Further, at all relevant times, Ms. Aquino's principal place of employment was located at 6800 Big Beaver Boulevard, Suite H, Beaver Falls, Pennsylvania 15010, which is located within ten (10) miles of the Derailment Site.

5.      As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Aquino has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

6.      At all relevant times, Plaintiff Raeann Bankston was an adult citizen of Ohio residing at 100 Covington Drive, East Palestine, Ohio, 44413.

7.      As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Bankston has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her

3

property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

8.      At all relevant times, Plaintiff Holly Carroll was an adult citizen of Ohio residing at 51615 Darlington Road, #1, Negley, Ohio 44441.

9.      As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Carroll has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

10.     At all relevant times, Plaintiff Alice M. Craft was an adult citizen of Ohio and the owner-occupier of the real property located at 3191 North Pleasant Drive, East Palestine, Ohio 44413.

11.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Craft has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

12.     At all relevant times, Plaintiff Todd Craft was an adult citizen of Ohio residing at 1487 Lake Road, Conneaut, Ohio 44030.

13.     Further, at all relevant times, Mr. Craft's principal place of employment was located at 2535 Middletown Road East, Poland, Ohio 44514, which is located within ten (10) miles of the Derailment Site.

14.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Craft has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and

4

place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

15.     At all relevant times, Plaintiff Kristine Croston was an adult citizen of Pennsylvania and the resident-owner of the real property located at 3612 Orchard Street, Beaver Falls, Pennsylvania 15010.

16.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Croston has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

17.     At all relevant times, Plaintiff Robert Delposen was an adult citizen of  Pennsylvania residing at 2715 Darlington Road, Beaver Falls, Pennsylvania 15010.

18.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Delposen has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

19.     At all relevant times, Plaintiff Glenn Dixon was an adult citizen of Ohio residing at 524 East Clark Street, East Palestine, Ohio 44413.

20.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Dixon has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

21.     At all relevant times, Plaintiff John Dryfuse was an adult citizen of Ohio residing at 674

½ East Main Street, East Palestine, Ohio 44413.

22.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Dryfuse has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

23.     At all relevant times, Plaintiff Brad Edwards was an adult citizen of Pennsylvania residing at 239 Kay Street, Wampum, Pennsylvania 16157.

24.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Edwards has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

25.     At all relevant times, Plaintiff Olivia Foster was an adult citizen of Ohio residing at 46390 Mills Street, Rogers, Ohio 44455.

26.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Foster has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

27.     At all relevant times, Plaintiff Oscar Gaunt was an adult citizen of Pennsylvania residing at 267 Oakville Road, Beaver Falls, Pennsylvania 15010.

28.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Gaunt

has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

29.    At all relevant times, Plaintiff Karen Gilmore was an adult citizen of West Virginia residing at 3769 Blairs Ridge Road, Moundsville, West Virginia 26041.

30.    Since the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Gilmore's principal place of employment has been in East Palestine, Ohio where she works traffic control every weekend.

31.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Gilmore has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

32.    At all relevant times, Plaintiff Sarah Ann Graham was an adult citizen of Ohio residing at 3383 Pinewood Drive, 106, New Waterford, Ohio 44445.

33.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Graham has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

34.    At all relevant times, Plaintiff Debra Lee Gray was an adult citizen of Ohio residing at 9227 Ottawa Trail, Negley, Ohio 44441.

35.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Gray

7

has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

36. At all relevant times, Plaintiff Dylan Hall was an adult citizen of Ohio residing at 11140 Youngstown Pittsburg Road, #24, New Middletown, Ohio 44442.

37. Further, at all relevant times, Mr. Hall's principal place of employment was located at 2875 East State Street, Salem, Ohio 44460, which is located within fifteen (15) miles of the Derailment Site.

38. As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Hall has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

39. At all relevant times, Plaintiff Randy Hogue was an adult citizen of Pennsylvania residing at 1024 Old State Road, Newcastle, Pennsylvania 16101.

40. As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Hogue has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

41. At all relevant times, Plaintiff Elijah D. Holloway was an adult citizen of Pennsylvania residing at 114 St. Tropez Circle, Beaver Falls, Pennsylvania 15010.

42. As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr.

Holloway has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

43.    At all relevant times, Plaintiff Tammie Howarth was an adult citizen of Pennsylvania and the resident-owner of the real property located at 319 State Route 168, New Galilee, Pennsylvania 16141.

44.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Howarth has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

45.    At all relevant times, Plaintiff Laryssa Jackson was an adult citizen of Ohio residing at 1203 Bacon Avenue, East Palestine, Ohio 44413

46.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Jackson has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

47.    At all relevant times, Plaintiff Nicole Jamison was an adult citizen of Pennsylvania residing at 116 Colonial Oaks, Beaver Falls, Pennsylvania 15010.

48.    As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Jamison has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts

dispersed by Defendants into the air, soil and water.

49.     At all relevant times, Plaintiff James Jones was an adult citizen of Pennsylvania residing at 102 Locus Stret, New Galilee, Pennsylvania 16141.

50.     Further, at all relevant times, Mr. Jones' principal place of employment was located at 900 Washington Avenue, New Galilee, Pennsylvania 16141, which is located within ten (10) miles of the Derailment Site.

51.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Jones has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

52.     At all relevant times, Plaintiff Patricia L. Kasserman was an adult citizen of Ohio residing at 368 East North Avenue, East Palestine, Ohio 44413.

53.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Kasserman has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

54.     At all relevant times, Plaintiff Timothy Lambright was an adult citizen of Ohio and the resident-owner of the real property located at 222 South Market Street, East Palestine, Ohio 44413.

55.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Lambright has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts

dispersed by Defendants into the air, soil and water.

56.     At all relevant times, Plaintiff Matt Liberty was an adult citizen of Pennsylvania and the resident-owner of the real property located at 220 Little Beaver Road, Enon Valley, Pennsylvania 16120, where he owns/operates a garlic farm approximately 5-6 acres.

57.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Liberty has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

58.     At all relevant times, Plaintiff Christopher Lucas was an adult citizen of Ohio residing at 10710 Main Street, New Middleton, Ohio 44442.

59.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Lucas has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

60.     At all relevant times, Plaintiff Linda McLaughlin was an adult citizen of Ohio and the resident-owner of the real property located at 368 East Taggart Street, East Palestine, Ohio 44413.

61.     Further, Ms. McLaughlin owns a rental property located at 13 Carla Drive, Darlington, Ohio 16115, which is located within 1,000 ft. of the Derailment Site.

62.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. McLaughlin has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals

11

and their byproducts dispersed by Defendants into the air, soil and water.

63.     At all relevant times, Plaintiff Nathan Minerd was an adult citizen of Ohio residing at 515 Parkcliffe, Youngstown, Ohio 44511.

64.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Minerd has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

65.     At all relevant times, Plaintiff Albert L. Nahar II was an adult citizen of Pennsylvania residing at 560 Cannelton Road, Darlington, Pennsylvania 16115.

66.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Nahar has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

67.     At all relevant times, Plaintiff Diana Nizer was an adult citizen of Ohio and the resident-owner of the real property located at 49687 Calcutta Smithferry Road, East Liverpool, Ohio 43920.

68.     Further, at all relevant times, Ms. Nizer's principal place of employment was located at 100-298 10th Street, Midland, Pennsylvania 15059, which is located within fifteen (15) miles of the Derailment Site.

69.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Nizer has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their

12

byproducts dispersed by Defendants into the air, soil and water.

70.     At all relevant times, Plaintiff Sheena Nolan was an adult citizen of Pennsylvania residing at 133 Chestnut Ridge Drive, Beaver Falls, Pennsylvania 15010.

71.     Further, at all relevant times, Ms. Nolan's principal place of employment was located at 1612 7th Avenue, Beaver Falls, Pennsylvania 15010, which is located within fifteen (15) miles of the Derailment Site.

72.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Nolan has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

73.     At all relevant times, Plaintiff Patrick Palmer was an adult citizen of Pennsylvania and the resident-owner of the real property located at 599 Lisbon Road, Darlington, Pennsylvania 16115, where he raises cattle.

74.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Palmer has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

75.     At all relevant times, Plaintiff Rocco Anthony Pietz was an adult citizen of Pennsylvania residing at 44 North Walnut Street, Ambridge, Pennsylvania 15003.

76.     Further, at all relevant times, Mr. Pietz's principal place of employment was located at 120 Brighton Street, Beaver Falls, Pennsylvania 15010, which is located within fifteen (15) miles of the Derailment Site.

77.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in

connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Pietz has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property and place of employment by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

78.     At all relevant times, Plaintiff Ronald Prokop was an adult citizen of Ohio and the resident-owner of the real property located at 11257 Market Street, North Lima, Ohio 44452, where he operates an auto detailing business out of his garage.

79.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Prokop has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

80.     At all relevant times, Plaintiff Mark Richard was an adult citizen of Ohio residing at 3419 North Pleasant Drive, East Palestine, Ohio 44413.

81.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Richard has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

82.     At all relevant times, Plaintiff Ronald Roach was an adult citizen of Ohio and the resident-owner of the real property located at 16115 State Road 170, East Liverpool, Ohio 43920.

83.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Roach has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and

14

organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

84.     At all relevant times, Plaintiff Donald Simmons was an adult citizen of Pennsylvania residing at 41 Hemlock Drive, Beaver Falls, Pennsylvania 15010.

85.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Simmons has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

86.     At all relevant times, Plaintiff Penny Singleton was an adult citizen of Pennsylvania and the resident-owner of the real property located at 625 McKinley Road, Darlington, Pennsylvania 16115.

87.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Ms. Singleton has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

88.     At all relevant times, Plaintiff Charles W. Will was an adult citizen of Ohio and the owner-occupier of the real property located at 6084 Millrock Road, New Waterford, Ohio 44445.

89.     As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the February 3, 2023 train derailment and resulting toxic chemical explosion, Mr. Will has suffered damages, including, but not limited to, loss of income, and an increased risk of cancer and organ damage from exposure to and inhalation of toxic chemicals, and contamination of his property by egregiously high and plainly dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water.

*The Railroad Defendants*

90.     Defendant NSC is a publicly traded corporation that is organized and existing under the laws of the Commonwealth of Virginia with its principal place of business located at 650 West Peachtree Street, NW, Atlanta, Georgia 30308.

91.     Defendant NSC plays a controlling role in decisions regarding the operations of NSRC, which operates a freight railroad over 35,000 miles of track in 22 states, transporting all manner of materials and goods, including coal, intermodal containers, agricultural products, chemicals, metals, and automotive products.

92.     Defendant NSRC is a wholly owned subsidiary of NSC.  NSRC is a Class I railroad corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business located at 650 West Peachtree Street, NW, Atlanta, Georgia 30308.

93.     Defendant NSRC is a common carrier that accepts hazardous substances for transport.

94.     Defendants NSC and NSRC operated Norfolk Southern Train 32N and its railcars in their Keystone Division in Pennsylvania, at all relevant times.

95.     Defendants NSC and NSRC owned the locomotive and certain of the railcars on Norfolk Southern Train 32N at all relevant times.

96.     At all relevant times, NSC and NSRC acted individually, as well as by and through one another and their respective officers, directors, executives, employees, contractors, subcontractors, and/or agents.

*The Railcar Defendants*

97.     Defendant General American Marks Company is a Delaware corporation with its principal place of business in Chicago, Illinois.  General American Marks Company is a wholly owned subsidiary of Defendant GATX Corporation.

98.     Upon information and belief, Defendant General American Marks Company owns and maintains a fleet of railcars for use in transportation of goods and products.

99.     At all relevant times, Defendant General American Marks Company was the owner of one of the railcars (GPLX 75465, "Car 23") in the consist of Train 32N that derailed on February 3, 2023.

100.    Car 23 is the railcar that commenced the derailment of Train 32N when a resurfaced and/or reconditioned wheel bearing critically failed.

101.    At all relevant times, Defendant General American Marks Company acted individually, as well as by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

102.    Defendant Oxy Vinyls, LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business in Dallas, Texas.

103.    The only General Partner of Oxy Vinyls is Occidental PVC, LLC, and the only Limited Partner of Oxy Vinyls is Occidental Chemical Corporation. Occidental Chemical Corporation is a New York corporation with its principal place of business in Dallas, Texas. The sole member of Occidental PVC, LLC is Occidental Chemical Corporation.

104.    Defendant Oxy Vinyls is a leading North American manufacturer of vinyl resins, chlorine and caustic soda, key building blocks for a number of plastic products.

105.    Upon information and belief, Defendant Oxy Vinyls owns and maintains a fleet of railcars for use in transportation of its goods and products, including vinyl chloride.

106.    At all relevant times Defendant Oxy Vinyls was the owner and shipper of three of the five railcars (OCPX 80235 ("Car 27"), OCPX 80179 ("Car 28"), and OCPX 80370 ("Car 53")) carrying vinyl chloride in the consist of Train 32N that derailed on February 3, 2023.

107.    At all relevant times, Defendant Oxy Vinyls was also the shipper of two of the other railcars carrying vinyl chloride in the consist of Train 32N that derailed on February 3, 2023: TILX 402025, "Car 26" owned by Defendant Trinity Industries Leasing Company; and GATX 95098, "Car 29," owned by Defendant GATX Corporation.

108.    At all relevant times, Defendant Oxy Vinyls acted individually, as well as by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

109.    Defendant GATX Corporation ("GATX") is a publicly traded corporation organized and existing under the laws of the State of New York with its principal place of business in Chicago, Illinois. Defendant GATX is a leading global railcar lessor, owning fleets in North America, Europe and India.

110. At all relevant times, Defendant GATX was the owner of one of the five railcars (GATX 95098, "Car 29") carrying vinyl chloride in the consist of Train 32N that derailed on February 3, 2023.

111. At all relevant times, Defendant GATX acted individually, as well as by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

112. Defendant Trinity Industries Leasing Company ("TILC") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Dallas, Texas.

113. Upon information and belief, Defendant TILC, a wholly owned subsidiary of Trinity Industries, Inc., owns a fleet of railcars, as well as originates and manages railcar leases for third party shippers.

114. At all relevant times, Defendant TILC was the owner of one of the five railcars (TILX 402025, "Car 26") carrying vinyl chloride in the consist of Train 32N that derailed on February 3, 2023.

115. At all relevant times, Defendant TILC acted individually, as well as by and through its officers, directors, executives, employees, contractors, subcontractors, and/or agents.

116. Upon information and belief, all Railcar Defendants were aware that transportation of the railcars from the Midwest to the East Coast would involve passing through Ohio.

## JURISDICTION AND VENUE

117. This Court has subject matter jurisdiction over the claims asserted in this action under 28 U.S.C. § 1332 because this lawsuit is between citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of costs and interest.

118. This Court has personal jurisdiction over Defendants because they regularly engage in business within the state of Ohio, were engaged in business within the state of Ohio prior to and at the time of the derailment, and because the claims asserted herein arise from the business activities and tortious conduct of Defendants within the state of Ohio prior to and at the time of the derailment.

119. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the Northern District of Ohio, and Plaintiffs were injured because of tortious activity in this District.

## FACTUAL ALLEGATIONS

### *The Relationship Between NSC and NSRC*

120.    Both NSC and NSRC operate out of the same corporate headquarters, and the President, Vice President, Chief Financial Officer, and Treasurer for NSRC hold the same or very similar positions in NSC.

121.    NSC and NSRC are jointly and severally liable for conduct alleged herein because they acted in concert and under alter ego and piercing the corporate veil theories, including based on the domination and /or control by NSC and the interlocking and overlapping officers and directors.

122.    The United States Surface Transportation Board requires railroad companies operating within the United States to submit an annual report ("Annual Report").

123.    NSC's 2021 Annual Report states that all of NSC's subsidiaries were under the common control of NSC, and that rail operations are coordinated at the holding company level by NSC's Chief Operating Officer.

124.    The 2021 Annual Report identifies NSRC as the principal subsidiary of NSC.

125.    Clairborne L. Moore, the Vice President and Controller for NSC, signed the 2021 Annual Report.

126.    In affidavits filed in federal ligation[3], Jason Zampi, a Vice President and Controller for NSC, stated that the annual reports submitted to the Surface Transportation Board are prepared by personnel of NSC with knowledge of and a business duty to prepare the information contained in the annual reports.

127.    In affidavits filed in that same federal litigation, Roger Petersen, NSC's General Counsel for Litigation, stated that NSC "directs, controls, oversees, and handles litigation involving it and its wholly owned subsidiaries, including [NSRC]."

128.    Approximately eighty percent (80%) of the compensation for NSC's executives are based on performance metrics.

_____

[3]*See Coker v. Norfolk Southern Corporation, et al.*, Civil Action No. 2:18-cv-1364 (S.D. Ala 2018) (Dk. No. 34-1, 34-2).

129.    These metrics focus on performance measures such as operating ratio and operating income for NSC subsidiaries, including NSRC. Operating ratio looks at operating expenses as a percentage of revenue. Operating income looks at operating revenue fewer operating expenses.

130.    These financial metrics were selected to motivate and reward NSC's executives for increasing revenue, improving operating efficiency, and reducing expenses of its railroad subsidiaries.

131.    NSC's executives achieve these metrics by controlling subsidiaries' operations, which includes the operations of NSRC.

132.    Over the past four years, NSC's Annual Reports show a stark contrast between the increases in operating income and the drop in railroad operating costs.

133.    The drop in operating costs includes reductions in NSC and/or NSRC spending to repair, service, and maintain locomotives and freight cars, perform train inspections, and pay engine crews and train crews.

134.    In 2019, Mike Wheeler, then the Executive Vice President and Chief Operating Officer for NSC, issued Operating Rules governing the operations of all of NSC's railroad subsidiaries, including NSRC.

135.    Upon information and belief, these same or similar Operating Rules were in place at the time of the train derailment and subsequent explosion.

136.    These Operating Rules cover almost every aspect of NSRC's operations, including train inspections, use of defective equipment detectors, train movement, braking, and positive train control.

137.    NSC has also issued Railroad Special Hazmat Instructions that govern the transportation and handling of hazardous materials by NSRC employees.

138.    NSC requires each NSRC employee who inspects or transports hazardous materials by rail to have a copy of and comply with the Railroad Special Hazmat Instructions.

139.    Upon information and belief, NSC's Railroad Special Hazmat Instructions were in place at the time of the train derailment and subsequent explosion.

140.    Further, NSC trains each NSRC employee who transports hazardous materials.

*NSC and NSRC's Prolific History of Train Derailments*

20

141.    Between 1990 and 2022, there were a total of 55,755 train derailments throughout the United States, for an average of 1,742 train derailments a year.[4]

142.    According to the Federal Railroad Administration ("FRA"), NSC and NSRC had the most derailments of all railroad companies in Ohio from 2019 through 2022, with 69 accidents total—22 in 2019, 18 in 2020, 15 in 2021 and 14 in 2022.

143.    According to the FRA, NSC and NSRC also had the most derailments of all railroad companies in Pennsylvania. This includes 76 total accidents from 2019 to 2022—23 in 2019, 14 in 2020, 23 in 2021, and 16 in 2022.

144.    According to the FRA, NSC and NSRC also had the most derailments of all railroad companies in West Virginia. This includes 13 total accidents from 2019 to 2022—4 in 2019, 6 in 2020, 2 in 2021, and 1 in 2022.

145.    According to data from the FRA, there were a total of 103 derailments in January 2023, and 11 were NSC and NRSC derailments.  Although the FRA only has publicly available data through January 2023, additional NSC and NRSC derailments have occurred this year: February 16 in Van Buren Township, Michigan; February 16 in Mingo County, West Virginia; February 25 in Lexington, North Carolina; March 4 in Springfield, Ohio; March 9 in Iron City, Alabama; Aril 8 in Pittsburgh, Pennsylvania; and April 9 in Jasper, Alabama.

146.    NSC and NSRC's record of train derailments and accidents, especially in recent years, is caused, in part, by its adoption of operating procedures referred to as "Precision Scheduled Railroading" ("PSR").

147.    More specifically, in 2019, NSC and NSRC launched an "ambitious three-year strategic plan," which relied heavily on PSR to achieve "goals that include creating longer trains, continuing productivity initiatives and finding growth opportunities."[5]

148.    In plain speak, PSR was NSC's and NSRC's plan to cut jobs, cut costs, cut safety and

---

[4]*See* Federal Railroad Safety Administration. Office of Safety Analysis, Table 3.16 data, available at 3.16 - Summary of Train Accidents With Reportable Damage, Casualties, and Major Causes (dot.gov).
[5]*See Coker v. Norfolk Southern Corporation, et al.*, Civil Action No. 2:18-cv-1364 (S.D. Ala 2018) (Dk. No. 34-1, 34-2).

increase risks – all so they could increase their profits.

149.    PSR eliminates necessary inspections, maintenance, repairs and safety devices so that trains stay in depots for shorter amounts of time.  The elimination of these tasks also allowed NSC and NSRC to eliminate a number of jobs for inspectors, maintenance workers and repair workers.

150.    PSR is a widely criticized practice in the railroad industry because it eliminates jobs while increasing the overall size and weight of trains leading to increased safety risks.

151.    Increasing the overall size and weight of trains makes trains more difficult to control, renders safety devices less effective, and increases the risks of train wrecks.

152.    PSR also deprioritizes rail and railcar inspections, maintenance, repairs, and safety devices in favor of increasing the speed and efficiency with which loads are transported.

153.    For example, NSC and NSRC were aware that there are different, safer braking mechanisms available for their trains, including Electronically Controlled Pneumatic (ECP) brakes, which have the potential to reduce train stopping distances by up to sixty percent. However, under its PSR program, NSC and NSRC prioritized profits over safety by utilizing outdated airbrakes instead of ECP brakes in its trains.

154.    NSC and NSRC's decision to adopt PSR also led to the FRA determining that between January 2022 and May 2022, both companies suffered from significant safety violations including undercounting, inadequately observing rules failures, and failing to verify the performance of operational tests.[6] FRA noted that "NS did not take immediate actions to remediate defective conditions" and that "these conditions have exposed crews to increased hazards, potential property damage, and injuries due to defective equipment knowingly left in service". Additionally, FRA identified a number of rail component defects, and warned Norfolk Southern that "when critical components are not maintained, there is an increased risk of sudden failure with catastrophic potential."

155.    NSC and NSRC's decision to adopt PSR likewise contributed to both companies cutting

---

[6]U.S. Dept. of Transportation, FRA Audit Report of Norfolk Southern Railway Company, FRA Audit Number:    2022-NS    Special    Audit-01-1,    at    7,    9-10,    available    at https://railroads.dot.gov/sites/fra.dot.gov/files/202211/Final%20Norfolk%20Southern%20Audit%20Report%202022%20%28003%29.pdf  (July  8, 2022) (last visited April 13, 2023).

the use of signalmen to install, repair, and maintain signal systems, which railroads use to direct trains from one location to the next safely and on time.

156.    These same signalmen are responsible for inspecting, maintaining, and repairing wayside detectors like "hot box" detectors, which alert operators to equipment failures while the train is in operation.

157.    Under their PSR program, NSC and NSRC have no such signalmen employed in or around the area of East Palestine, Ohio.

158.    Furthermore, the wayside detectors are not monitored locally, but by NSC and NSRC's train dispatcher located in Atlanta, Georgia.

### *Responsibilities of the Railcar Defendants*

159.    In addition to railroads like Norfolk Southern, the responsibility for safe transport of cargo, including hazardous materials, via rail belongs to the owners and lessees of the railcars and the manufacturers and shippers of the materials being transported.

160.    For example, tank car manufacturers, owners and lessees are obligated to ensure tank cars are compliant with federal laws and regulations and capable of safely moving hazardous materials pursuant to 49 C.F.R. part 180.

161.    Under 49 C.F.R. part 173, shippers, in turn, are responsible for the safe loading, packaging and inspection of hazardous goods, including certifying that hazardous materials are properly classified, appropriately loaded into tank cars and shipped with proper labeling and safety materials to enable first responders to address any accidental release.

162.    Shippers are likewise charged with ensuring that the railcars and equipment they use to transport their materials, including hazardous materials, are compatible with both the certificate of approval issued for the railcar and the nature of the lading.

163.    While railroads like Norfolk Southern are ultimately responsible for ensuring the safe transport of all rail cars, including any hazardous materials in the railcars they accept for transport along their systems, owners, lessees and shippers are also responsible for any defects they cause, or fail to remedy, or otherwise fail to comply with the freight car safety regulations. *See* 49 CFR 215.7.

164.    With respect to the derailment of Train 32N, General American Marks Company, was at all relevant times the owner of railcar GPLX75465 ("Car 23").

165.    Car 23 is the railcar that commenced the derailment of Train 32N when a resurfaced and/or reconditioned wheel bearing critically failed.

166.    With respect to the derailment of Train 32N, Oxy Vinyls LP was at all relevant times the owner of railcars OCPX80235 ("Car 27"), OCPX80179 ("Car 28"), and OCPX80370 ("Car 53").

167.    With respect to the derailment of Train 32N, GATX Corporation was at all relevant times the owner of railcar GATX95098 ("Car 29").

168.    With respect to the derailment of Train 32N, Trinity Industries Leasing Company, was at all relevant times the owner of railcar TILX402025 ("Car 26").

169.    Shipping from its La Porte, Texas, facility, Oxy Vinyls at all relevant times was also the shipper of Cars 26, 27, 28, 29 and 53 in the consist of Train 32N.

170.    These Cars (26, 27, 28, 29 & 53) were each DOT-105J300W specification tank cars and each contained vinyl chloride monomer, which was released during the February 3, 2023 derailment, including the subsequent controlled release on February 6, 2023.

### Car 23

171.    Car 23 is a hopper car owned by General American Marks Company that was carrying polyethylene pellets when it was accepted for shipment by Norfolk Southern at the Terminal Railroad Association ("TRAA") of St. Louis yard on or about February 1, 2023.

172.    The manual for the failed wheel bearing in use on Car 23 states "cars, coaches and locomotives equipped with roller bearings that remain stationary should be moved one car length every six months to distribute lubricant over the bearing surfaces."

173.    For these reasons, responsible railcar owners prevent railcars from sitting stationary for long periods because grease separation can occur leading to a reduction in the amount of lubrication around the bearings that negatively impacts functionality.

174.    Additionally, when a railcar sits for extended periods of time in the elements, water and other environmental factors begin to degrade the structure and lubrication of the bearing leading to

24

defects.

175.    Upon information and belief, Car 23 was twice stationary for longer than six months in the lead up to the derailment of Train 32N; first a period of 565 days ending in August 2018 and second a period of 206 days ending in May 2019.

176.    Upon information and belief, despite sitting stationary for over two of the roughly five years leading up to the derailment of Train 32N, General American Marks Company nor GATX ever conducted a full inspection of the railcar's wheelset, including the wheel bearing, which would have revealed the critical defect that led to the events sets forth in this Amended Complaint.

177.    General American Marks Company and/or GATX's conduct in allowing Car 23 to remain stationary caused the wheel bearings to deteriorate and become ineffective, which in combination with the acts and omissions of the Railroad Defendants as set forth herein, proximately caused or contributed to the derailment and subsequent release of hazardous materials, including vinyl chloride, between February 3-6, 2023.

### *Vinyl Chloride Cars 26, 27, 28, 29 and 53*

178.    As referenced above, railcar owners and shippers are responsible for a variety of compliance and maintenance measures for tank cars that carry hazardous materials.

179.    Among these responsibilities are those set out in 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517, which obligate railcar owners to have appropriate certifications and qualifications for their tank cars, as well as impose certain maintenance requirements on the railcars and their component parts.

180.    However, upon information and belief, following the derailment of Train 32N, the FRA discovered that there were multiple discrepancies between the approval, certification and qualification of Cars 26, 27, 28, 29 and 53 and the Cars' actual, physical characteristics, including:

a.    Car 26 had actual, physical characteristics that made it incompatible with its AAR 4-2 Certificate of Approval;

b.    Car 29 had an incompatible pressure relief device ("PRD") replaced and never received the special regulatory approval needed to ship vinyl chloride; and

c.    Cars 27, 28 and 53 each had required information missing from their Certificates of

Approval, and Car 27 had modifications that were neither documented nor approved.

181.  In short, none of the Cars carrying vinyl chloride in the consist of Train 32N were properly constructed, approved and/or certified for transport at the time of the derailment on February 3, 2023.

182.  Additionally, several of the Cars carrying vinyl chloride in the consist of Train 32N were constructed with, or had features containing, aluminum.  The use of aluminum in railcars transporting vinyl chloride can be problematic because aluminum components can melt or otherwise be damaged in the event of a fire, as appears to have happened here.  In addition, there is a potential for an adverse chemical reaction if the vinyl chloride is exposed to aluminum in the course of transit.

183.  More specifically, the following Cars were constructed with, or had features containing, aluminum in the consist of Train 32N:

   a.  Car 26 had aluminum-coated springs in its PRD device;

   b.  Cars 27, 28 and 29 had aluminum protective housing, as well as aluminum handwheels; and

   c.  Car 53 included angle valve handwheels constructed from aluminum.

184.  In short, Cars 26, 27, 28, 29, and 53, each carrying vinyl chloride in the consist of Train 32N, were constructed of materials that were inappropriate for, or inconsistent with, the shipment of vinyl chloride at the time of the derailment on February 3, 2023.

185.  Oxy Vinyls, GATX, and TILC's conduct in shipping vinyl chloride, or allowing vinyl chloride to be shipped, using unapproved, uncertified and/or incompatible railcars as required by federal regulations and industry standards, which in combination with the acts and omissions of the Railroad Defendants as set forth herein, proximately caused or contributed to the release of hazardous materials, including vinyl chloride, between February 3-6, 2023.

### *The February 3, 2023 Derailment*

186.  On Friday February 3, 2023, NSC and NSRC Train 32N, consisting of 149 cars, was carrying abnormally dangerous and ultrahazardous chemicals including, but not limited to, vinyl chloride, butyl acrylate, benzene residue, ethylene glycol monobutyl ether, ethylhexyl acrylate and isobutylene while traveling a downhill route eastbound from Illinois to Pennsylvania on main track 1 of the

26

NSC/NSRC Fort Wayne line of the Keystone Division.

187.    According to a VICE article entitled *'32 Nasty': Rail Workers Say They Knew the Train That Derailed in East Palestine Was Dangerous*, "two workers … said 32N in particular was a known safety risk."[7]

188.    These two workers told *VICE* that "multiple red flags, including two mechanical problems, about 32N went undetected or were ignored in the hours leading up to the crash."[8]

189.    According to the article, 32N has a nickname among some rail workers "for a reason."[9] They call this one "**32 Nasty**."[10]

190.    At approximately 9:00 p.m., in the area of East Palestine, Ohio, approximately 38 of the train cars derailed and an additional twenty railcars were damaged, several of which were carrying dangerous and hazardous industrial materials.  The derailment occurred in the State of Ohio, approximately one mile from the Ohio-Pennsylvania border.

191.    The train was already ablaze when at 8:13 p.m., it passed through Salem, Ohio, which is located 20 miles west of the eventual site of the fiery derailment in East Palestine.

192.    Indeed, surveillance video from cameras located along the rails in Salem, Ohio, showed what appears to be a wheel bearing in the final stage of overheating approximately 45 minutes before the derailment.



_____

[7]Vice, *'32 Nasty:' Rail Workers Say They Knew the Train That Derailed in East Palestine Was Dangerous*, available at https://www.vice.com/en/article/88qze4/32-nasty-rail-workers-say-they- knew-the-train-that-derailed-in-east- palestine-was-dangerous (Feb. 15, 2023) (last visited April 13, 2023).
[8]*Id.*
[9]*Id.*
[10]*Id.*

Still frame from surveillance video taken in Salem, Ohio - 20 miles away from the train derailment site.

193.    On the Fort Wayne Line, NSC and NSRC had equipped their rail network with hotbox detectors to assess the temperature conditions of railcar wheel bearings while en route.

194.    The hotbox detectors are used to detect overheated axels and/or wheel bearings on railcars and provide real-time warnings to train crew members.

195.    NSC and NSRC sets its own standards, policies, and procedures for the placement of hotbox detectors, as well as the alarm thresholds for above ambient temperature readings.

196.    NSC/NSRC Train 32N passed three hotbox detectors before the derailment.

197.    At milepost 79.9, Train 32N passed over a NSC/NSRC hotbox detector and the suspect wheel bearing from railcar no. 23 had a recorded temperature of 38° F above ambient.

198.    When Train 32N passed the next NSC/NSRC hotbox detector, at milepost 69.01, the suspect wheel bearing from railcar no. 23 had a recorded temperature of 103° F above ambient and was visibly already on fire.

199.    When Train 32N passed the next NSC/NSRC hotbox detector, at milepost 49.81, the suspect wheel bearing from railcar no. 23 had a recorded temperature of 253°F above ambient.

200.    This hotbox reading of 253° F above ambient resulted in an alarm message instructing the crew to slow and stop the train to inspect the hot axle. The engineer applied the train's dynamic brake, but it was already too late. This malfunctioning railcar axle is consistent with an overheated wheel bearing, which ultimately caused the train to derail and trigger the application of the emergency brakes as the train passed through East Palestine.

201.    Eleven of the derailed cars carried hazardous materials, and five of them contained vinyl chloride:

| Rail Car # | Hazardous Materials | Amount |
|---|---|---|
| TILX 402025 | Vinyl Chloride | 178,300 pounds |

| | | |
|---|---|---|
| OCPX 80235 | Vinyl Chloride | 177,250 pounds |
| OCPX 80179 | Vinyl Chloride | 177,600 pounds |
| GATX 95098 | Vinyl Chloride | 178,150 pounds |
| OCPX 80370 | Vinyl Chloride | 176,100 pounds |
| SHPX 211226 | Ethylene Glycol Monobutyl Ether | 185,750 pounds |
| DOWX 73168 | Ethylhexyl Acrylate | 205,900 pounds |
| UTLX 205907 | Butyl Acrylate | 180,000 pounds |
| NATX 35844 | Isobutylene | 155,642 pounds |
| DPRX 259013 | Benzene | Residue |
| DPRX 258671 | Benzene | Residue |

202.    All told, the derailed cars of Train 32N were carrying over 1,600,000 pounds of toxic and hazardous chemicals.

203.    During and after the derailment, the hazardous chemicals, including, but not limited to vinyl chloride, butyl acrylate, benzene residue, ethylene glycol monobutyl ether, ethylhexyl acrylate, and isobutylene ignited, and the resulting fire continued to burn with increasing intensity from February 3-6, 2023.



204.    On Friday, February 3, 2023, the fire was large enough to be detected by the Pittsburgh, Pennsylvania weather radar for several hours. The fire appeared to reach its peak intensity around 10:40 p.m. when brighter colors appeared on radar and the smoke plume had traveled south of Beaver Falls, Pennsylvania.

205.    The radar also detected a value of 31.5 decibels at 10:40 p.m., which is the equivalent of moderate rain/snow, and is consistent with the smoke plume being blown to the south and east, traveling at least as far as Bridgewater, Pennsylvania at that time.





206.    Aerial surveillance showed an entanglement of rail cars with fires still burning and heavy smoke continuing to billow from the scene as officials tried to determine what was in each car from their exterior labels.



207.    As part of the initial response and subsequent investigation, NSC and NSRC produced the below photograph showing the derailed rail cars and describing their contents:



208.    Given the ongoing release of toxic and hazardous chemicals from the derailment, at approximately 11:00 p.m. on February 3, 2023, officials issued a shelter-in-place order for the entire town of East Palestine.

209.    On February 4, "[r]esponding crews discovered contaminated runoff on two surface water streams: Sulphur Run and Leslie Run."[11] It was also noted that the runoff "impacted aquatic life" and officials with the Ohio Department of Natural Resources has since reported that wildlife officials located approximately 3,500 dead fish in Leslie Run, Bull Creek, and the North Fork of Little Beaver Creek.

210.    As first responders battled the blaze from Febma1y 3 to 5, 2023, one railcar carrying vinyl chloride became a focus of concern when its emergency safety valves malfunctioned, and pressure started building to unsafe levels within the railcar's steel shell.

211.    On Sunday, February 5, first responders and others learned of "a drastic temperature

---

[11] https://response.epa,.gov/site/site_profile.aspx?site_id=l 5933.

change in a rail car, and there [was] the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile." Local officials and Ohio Governor Mike DeWine issued an evacuation order on the evening of February 5 for anyone living within a mile of the derailment site:



212.    These concerns were amplified when, on Monday, February 6, 2023, a drastic temperature change took place within the railcar with the malfunctioning safety valves, increasing the potential of a catastrophic tanker failure and explosion, and causing local officials to expand the evacuation area based on "new modeling information."

213.    Upon information and belief, NSC and NSRC reported to federal, state, and local officials that the only way to avoid a catastrophic tanker failure and explosion was to conduct a "controlled release" of the vinyl chloride in the compromised tanker.

214.    This "controlled release" called for NSC, NSRC and/or its contractors to detonate explosive charges on the compromised vinyl chloride tanker, so as to dump the vinyl chloride out of the tanker and into a trench where it would be lit on fire.

215.    Although the concern related to only one of the vinyl chloride cars, at 4:30 p.m. on Monday, February 6, 2023, NSC, NSRC and/or its contractors intentionally blew holes in, not just the one

33

tanker car of concern, but all five derailed rail cars containing vinyl chloride.

216.    This "controlled release" was anything but controlled.  Once the charges were detonated on the five vinyl chloride cars, there was a large, fiery explosion that released a large plume of thick black smoke forming a mushroom cloud over the entire area.



217.    This toxic mushroom cloud was caused by a temperature and weather inversion over the Derailment Site, which allowed the explosion to disperse dozens of toxic chemicals and combustion by-products, including hydrogen chloride and phosgene gas, for miles.

218.    More specifically, the smoke and particulate plume from the "controlled release" was trapped from rising higher into the atmosphere due to an inversion layer at around 3,000 feet. In other words, the toxic plume from the mushroom cloud reached a level in the atmosphere where it was unable to continue to rise vertically, so it began to spread out horizontally in a thick cloud cover.





219.    Upon information and belief, the smoke and particulate plume from the "controlled release" eventually traveled a total of 30 miles in each direction from the Derailment Site, contaminating the air, surfaces, soil, and water of Plaintiffs.

220.    On March 22, 2023, the Chair of the National Transportation Safety Board ("NTSB") characterized the derailment as "100% preventable" in her testimony before the U.S. Senate Environment and Public Works Committee.

### *Hazardous Chemicals Released*

221.    The following are the hazardous chemicals and combustion products detected in air, water, soil, and sediment samples taken within a 30-mile radius of the Derailment Site following the

"controlled release," along with the health and environmental effects associated with each. These chemicals are harmful to humans, as well as livestock, plants and crops. These chemicals may cause a direct effect on livestock, plants and crops, as well as an indirect effect on the food supply.

### 1.     Vinyl Chloride

222.    Vinyl chloride monomer ("vinyl chloride") is classified by the Environmental Protection Agency ("EPA") as a Group A human carcinogen—the most dangerous to human health.

223.    Vinyl chloride exposure can affect the cardiovascular, respiratory, and central nervous systems, and can cause death, difficulty breathing, lung irritation, chest pains, coughing, dizziness, headaches, eye irritation, and loss of consciousness.

224.    Vinyl chloride is a toxic chemical that is unstable and prone to explode if not maintained and handled with proper methods and conditions.

225.    Vinyl chloride is specified under the Hazardous Materials Transportation Act ("HMTA") as a hazard class 2.1, flammable gas.

226.    Specifically, just minutes of exposure to high, but attainable concentrations (over 1,000 ppm) of vinyl chloride may cause central nervous system depression with effects such as dizziness, drowsiness, disorientation, tingling, numbness or burning sensation of the hands and feet, impaired vision, nausea, headache, difficulty breathing, cardiac arrhythmias, unconsciousness, or even death.

227.    Exposure to higher concentrations of vinyl chloride can cause death due to central nervous system and respiratory depression.

228.    Vinyl chloride exposure also creates an increased risk of a rare form of liver cancer (hepatic angiosarcoma), as well as primary liver cancer (hepatocellular carcinoma), brain and lung cancers, lymphoma, and leukemia.

229.    According to the NTSB:

> Vinyl chloride [CAS # 75-01-4] is a colorless gas with a mild, sweet odor that is used to make polyvinyl chloride (PVC). It is a gas at room temperature; however, it is shipped as a liquid under pressure. It is highly flammable and vapor/air mixtures are explosive. The odor threshold for detection is about 3,000 parts per million (ppm) in air. The Occupational Safety and Health Administration (OSHA) regulates occupational exposures to vinyl chloride under 29 CFR 1910.1017. Paragraph (c) of the standard mandates that no employee may be exposed to vinyl chloride at concentrations greater

than 1 ppm averaged over any 8-hour period; no employee may be exposed at concentrations greater than 5 ppm averaged over any period not exceeding 15 minutes; and that no employee may be exposed to vinyl chloride by direct contact with liquid vinyl chloride. **Due to the significant difference between the odor threshold and the acceptable occupational exposure levels, workers can easily be overexposed without becoming aware of vinyl chloride's presence. The odor threshold is too high to provide adequate warning for hazardous concentrations**.

230. Just one pound of vinyl chloride released into the atmosphere can contaminate five acres to a level of 2 ppm.

231. Upon information and belief, the train derailment and resulting toxic chemical explosion released approximately **1,000,000 pounds** of vinyl chloride throughout the area surrounding the Derailment Site.

**2. Dioxins**

232. Dioxin is a term used to identify several chemical compounds.

233. These compounds can be placed into three closely related families: polychlorinated dibenzo-*p*-dioxins ("CDD"), polychlorinated debenzofurans ("CDF") and polychlorinated biphenyls ("PCB"). Compounds within all three of these families are highly toxic and have varying toxicity levels.

234. Each different form of Dioxin is called a "congener."

235. There are many dioxins and "dioxin-like" congeners: 75 different CDDs, 135 different CDFs and 209 different PCBs.

236. Dioxins are called persistent organic pollutants ("POP"), meaning they take a long time to break down once they are in the environment.

237. Dioxins are dangerous and deadly. The EPA and other entities, such as the World Health Organization, began assessing the potential human health risks associated with dioxins as early as the 1970s after animal studies showed one dioxin, TCDD, to be the most potent cancer- causing chemical studied to date.

238. Exposure to dioxins are known in the scientific and medical communities to cause cancer, liver damage, hormone changes, reproductive damage, miscarriages, birth defects, and decrease the ability to fight infection. Birth defects from dioxins have included skeleton and kidney defects, lowered immune responses, and effects on the development of the brain and the nervous system.

37

239. Dioxins are one of the strongest carcinogens known, causing many kinds of cancers.

240. Dioxin exposure, even in single doses and at very low concentrations, seriously disrupts normal reproduction in humans and other animals. It lowers fertility, increases prenatal mortality, causes birth defects, and increases the risk of endometriosis.

241. Dioxins interfere with the production and function of many different hormones, growth factors, and enzymes. Their effects can be long term, and their toxicity is much more severe and consistent in children than it is in adults.

242. Dioxins are particularly toxic to children. Dioxins adversely affect the developing immune, reproductive, nervous, and lymph systems. They cause cleft palate, hemorrhage and edema, impair hearing, and retard growth.

243. The adverse effects of Dioxin exposure to human health are varied and include:

    a. **Cancer:** lung, stomach, soft tissue, and liver;

    b. **Male Reproductive Toxicity:** reduced sperm count, testicular atrophy, abnormal testis structure, reduced testis size, lower male hormone levels, and feminization of hormonal and behavioral responses;

    c. **Female Reproductive Toxicity:** hormonal changes, decreased fertility, inability to maintain pregnancy, ovarian dysfunction, and endometriosis;

    d. **Developmental Toxicity:** birth defects, alterations in reproductive system, decreased sperm count, altered mating behavior, structural abnormalities in female genitalia, reduced fertility, delayed puberty, and neurological problems;

    e. **Immune Suppression:** increased susceptibility to infectious disease;

    f. **Hormonal Changes:** altered sex hormones, altered thyroid hormones, and altered digestive hormones;

    g. **Metabolic Changes:** altered glucose response, decreased insulin levels, altered fat metabolism, weight loss, wasting syndrome, fetal death, and diabetes;

    h. **Damage to the central and peripheral nervous systems:** impaired neurological development and subsequent cognitive deficits;

i.  **Organ Damage:** liver, thymus, spleen, bone marrow, lungs, and heart - leading to arrhythmias; and

j.  **Skin Disorders:** chloracne, hyperpigmentation, and hirsutism.

### 3.    Ethylene Glycol Monobutyl Ether

244.    Harmful exposure to ethylene glycol monobutyl ether occurs through ingestion or dermal contact.

245.    Inhaling ethylene glycol monobutyl ether can irritate the nose and throat. It can also cause nausea, vomiting, diarrhea, and abdominal pain.

246.    Exposure can cause headaches, dizziness, lightheadedness, and passing out, and it may damage the liver and kidneys.

### 4.    Isobutylene

247.    Acute exposure to isobutylene is associated with the following health effects: irritation of eyes, nose, and throat, frostbite (from dermal contact), headaches, dizziness, lightheadedness, and fatigue.

248.    Higher levels of isobutylene can cause coma and death. Chronic health hazards include cancer, reproductive harm, and other long term health effects.

### 5.    Benzene

249.    Benzene is a known human carcinogen according to the Department of Health and Human Services, the International Agency for Research on Cancer (IARC), and the EPA.

250.    Breathing very high levels of benzene can result in death, while high levels can cause drowsiness, dizziness, rapid heart rate, headaches, tremors, confusion, and unconsciousness.

251.    Exposure through ingestion can cause vomiting, irritation of the stomach, dizziness, sleepiness, convulsions, rapid heart rate, and death.

252.    The major effect of benzene from chronic exposure is on the blood. Benzene causes harmful effects to bone marrow and can cause a decrease in red blood cells leading to anemia. Benzene exposure can also cause leukemia and lymphoma in humans.

253.    Benzene can also cause excessive bleeding and can affect the immune system, increasing the chance of infection. Benzene may affect menstruation and decrease the size of ovaries in women

following many months of exposure to high levels.

### 6.  Butyl Acrylate

254.    Butyl acrylate can cause health effects due to inhalation and through dermal contact. Contact with butyl acrylate can irritate the nose, throat, and lungs. Butyl acrylate may cause a skin allergy.

255.    Exposure to butyl acrylate can cause headaches, dizziness, nausea, and vomiting.

256.    Repeated exposure can lead to permanent lung damage.

### 7.  Ethylhexyl acrylate

257.    Ethylhexyl acrylate is a flammable, clear, colorless liquid used in the production of paints and plastics.

258.    Exposure can cause drowsiness, convulsions, and irritation of the eyes and skin.

### 8.  Diethylene glycol

259.    Diethylene glycol is a clear, colorless, and near odorless liquid used to make various industrial products.

260.    Exposure can cause gastrointestinal symptoms, renal failure, and neurological issues.

### 9.  Hydrogen sulfide

261.    Hydrogen sulfide is a colorless gas with a strong odor of rotten eggs used in industrial settings including textile factories.

262.    Exposure can cause irritation to the eyes and respiratory system, apnea, coma, convulsions, dizziness, headache, weakness, irritability, insomnia, and upset stomach.

### 10.  Hydrogen cyanide

263.    Hydrogen cyanide is a colorless or pale-blue liquid or gas with a bitter, almond-like odor used in fumigation, electroplating, mining, and chemical synthesis.

264.    Hydrogen cyanide interferes with the human body's use of oxygen and can negatively impact the brain, heart, blood vessels, and lungs.

### 11.  Phosgene

265.    Phosgene was used as a chemical warfare agent during World War I and is banned by the 1925 Geneva Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases,

and of Bacteriological Methods of Warfare.

266. Exposure to phosgene in the air can cause eye and throat irritation. High amounts in the air can cause severe lung damage. Exposure can occur through inhalation, dermal contact, or (less likely) ingestion.

267. Higher levels of phosgene can cause lungs to swell, making it difficult to breathe.

268. Even higher levels can result in severe lung damage that might lead to death. Dermal contact with phosgene can result in chemical burns or may cause frostbite.

### 12. Hydrogen Chloride

269. Hydrogen chloride is irritating and corrosive to any tissue it contacts. Brief exposure to low levels causes throat irritation.

270. Exposure to higher levels can result in rapid breathing, narrowing of the bronchioles, blue coloring of the skin, accumulation of fluid in the lungs, and even death. Exposure to even higher levels can cause swelling and spasm of the throat and suffocation.

271. Following exposure, people may develop an inflammatory reaction to hydrogen chloride. This condition is called reactive airways dysfunction syndrome (RADS), a type of asthma caused by some irritating or corrosive substances.

272. Depending on the concentration, hydrogen chloride can produce conditions from mild irritation to severe burns of the eyes and skin.

273. Long-term exposure to low levels can cause respiratory problems, eye and skin irritation, and discoloration of the teeth. Swallowing concentrated hydrochloric acid will cause severe corrosive injury to the lips, mouth, throat, esophagus, and stomach.

### COUNT I(A)

### NEGLIGENCE AND NEGLIGENCE PER SE

**(On Behalf of All Plaintiffs Against the Railroad Defendants)**

274. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

275. The derailment, fire, uncontrolled release of toxic chemicals, and explosion of toxic

chemicals was caused by the negligence, carelessness and/or recklessness of the Defendants.

276.    Upon information and belief, Plaintiffs aver that the derailment, fire, release, and explosion of toxic chemicals was caused by the joint negligence, carelessness and/or recklessness of the Defendants, and is the fault of the Defendants as set forth above.

277.    In addition, and in the alternative, the derailment, fire, release, and explosion of toxic chemicals was caused by defective, unfit and/or unsafe equipment, which was in the care, custody and control of Defendants.  Defendants knew or should have known of the dangerous, unfit and/or defective condition of this equipment and are therefore liable for them.

278.    Defendants owed Plaintiffs a duty to use reasonable care in the transportation of hazardous materials through East Palestine, Ohio. Consistent with federal regulations and industry practices and procedures, these duties include, but are not limited to, the duty to:

    a.    Properly inspect their trains and railcars;

    b.    Not place in service or continue in service a car with an overheated roller bearing;

    c.    Not accept or transport any shipment of hazardous material that has pressure relief devices made of materials that are incompatible with the lading;

    d.    To maintain vigilant lookout during the operation of its trains and railcars;

    e.    To remedy defects in equipment and remove all cars that are unsafe to run;

    f.    To immediately notify train dispatchers about fires observed on roller bearings and the extent to which fires have spread beyond the roller bearing;

    g.    To properly calibrate, maintain, test, and operate train braking systems;

    h.    To properly develop and implement risk reduction programs;

    i.    To properly develop and implement risk-based hazard management programs;

    j.    To properly develop and implement safety performance evaluation processes;

    k.    Operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible or hazardous liquids;

l.      Utilize appropriate and available technology such as "wayside defect detectors" or "hot bearing detectors"; appropriately place such detectors to ensure timely alerting of any potential problems; implement appropriate policies for the use of such detectors including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and ensuring that such detectors are timely and properly inspected and maintained;

m.     Ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

n.      Ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

o.      Ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

p.      Prevent over-loading the train with too many railcars or materials;

q.      Load the railcars consistent with accepted practice;

r.      Load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

s.      Adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

t.      Hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of Train 32N on February 3, 2023;

u.      Train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N and issues that arose on February 3, 2023;

v.      Properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning

the operation of Train 32N on February 3, 2023;

w.     Ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

x.     Properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

y.     Route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

z.     Adequately warn those in danger of imminent exposure to hazardous chemicals;

aa.    Institute proper procedures and training for response to the mechanical malfunction of a rail car;

bb.    Institute proper procedures and training for response to derailment of railcars containing hazardous materials;

cc.    Institute proper procedures to avoid exposing hazardous materials to the environment;

dd.    Have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

ee.    Timely implement such an emergency response plan;

ff.    Transport and handle hazardous materials in a manner which would not cause Plaintiffs harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct;

gg.    Properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including avoiding the use of techniques that would further expose Plaintiffs, and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

hh.    Evacuate an appropriate geographical area to avoid exposing persons nearby to

44

hazardous materials and causing injury;

ii.      Timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

jj.      Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, to persons at risk of exposure, including those outside the evacuation zone;

kk.      Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone; and

ll.      Contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, into the surrounding air, water, real property, and persons.

279.      However, inconsistent with federal regulations and industry practice and procedures, Defendants negligently, carelessly and/or recklessly breached their duties to Plaintiffs by, among other things:

a.      Failing to properly inspect their trains and railcars;

b.      Placing in service or continuing in service a car with an overheated roller bearing;

c.      Accepting and transporting shipments of hazardous material that had pressure relief devices made of materials that were incompatible with the lading;

d.      Failing to maintain vigilant lookout during the operation of its trains and railcars;

e.      Failing to remedy defects in equipment and remove all cars that were unsafe to run;

f.      Failing to immediately notify train dispatchers about fires observed on roller bearings and the extent to which fires had spread beyond the roller bearing;

g.      Failing to properly calibrate, maintain, test, and operate train brake systems;

h.      Failing to properly develop and implement risk reduction programs;

i.      Failing to properly develop and implement risk-based hazard management programs;

j.      Failing to properly develop and implement safety performance evaluation processes;

k.      Failing to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible or hazardous liquids;

l.      Failing to utilize appropriate and available technology such as "wayside defect detectors" or "hot bearing detectors"; failing to appropriately place such detectors to ensure timely alerting of any potential problems; failing to implement appropriate policies for the use of such detectors including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and failing to ensure that such detectors are timely and properly inspected and maintained;

m.      Failing to ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

n.      Failing to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

o.      Failing to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

p.      Failing to prevent over-loading the train with too many railcars or materials;

q.      Failing to load the railcars consistent with accepted practice;

r.      Failing to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

s.      Failing to adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

t.      Failing to adequately hire, train, manage, oversee, and supervise their agents,

46

servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of Train 32N on February 3, 2023;

u.      Failing to adequately train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N and issues that arose on February 3, 2023;

v.      Failing to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of Train 32N on February 3, 2023;

w.      Failing to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

x.      Failing to properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

y.      Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

z.      Failing to adequately warn those in danger of exposure to hazardous chemicals;

aa.     Failing to institute proper procedures and training for response to the mechanical malfunction of a rail car;

bb.     Failing to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

cc.     Failing to institute proper procedures to avoid exposing hazardous materials to the environment;

dd.     Failing to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

ee.     Failing to timely implement such an emergency response plan;

ff.     Failing to transport and handle hazardous materials in a manner which would not cause Plaintiffs injury or harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct.

gg.     Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiffs, and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

hh.     Failing to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

ii.     Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

jj.     Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, to persons at risk of exposure, including those outside the evacuation zone;

kk.     Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

ll.     Failing to contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, into the surrounding air, water, real property;

mm.     Failing to otherwise reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, and other combustible liquids; and

nn.     Otherwise unreasonably causing injury to Plaintiffs in ways further investigation and discovery will reveal.

280.    Defendants owed and breached a duty of reasonable care commensurate with the risk of transporting hazardous materials, including vinyl chloride, butyl acetate, benzene residue, and combustible or hazardous liquids by railcar.

281.    Defendants owed and breached a duty of reasonable care commensurate with the release and burning of those hazardous materials, including the resultant release of phosgene and hydrogen chloride.

282.    Given the likelihood of contamination of neighboring areas and exposure to their residents, Defendants had a duty to investigate the extent to which the controlled release and burn of hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, were contaminating property at levels that would materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

283.    The damages to Plaintiffs were also caused by or aggravated by the fact that Defendants failed to take necessary actions following the derailment to mitigate the danger and harm associated with their operations.

284.    Additionally, the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20101 et seq., and its accompanying regulations are implemented to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents. 49 U.S.C. § 20101. The derailment that forms the basis of this lawsuit is currently under investigation by the National Transportation Safety Board ("NTSB"). Plaintiffs are currently unadvised of the full extent of the federal or state safety laws and regulations that Defendants or their agents may have violated but reserve the right to rely on such safety laws and regulations shown during discovery. However, upon information and belief, Defendants' conduct violated one or more regulations, including but not limited to the following:

a.     49 CFR Part 215, including but not limited to 49 CFR § 215.9, 49 CFR § 215.13, 49 CFR § 215.15, 49 CFR § 215.115, Appendix B of CFR Part 215, and Appendix D

of 49 CFR Part 215.

b. 49 CFR Part 229, including but not limited to 49 CFR § 229.7, and 49 CFR § 229.29.

c. 49 CFR Part 232, including but not limited to 49 CFR § 232.103 and 49 CFR § 232.109.

d. 49 CFR Part 271, including but not limited to 49 CFR § 271.101, 49 CFR § 271.103, 49 CFR § 271.211, and 49 CFR § 271.213.

e. 49 CFR Part 174, including but not limited to 49 CFR § 174.3.

f. 49 CFR Part 179, including but not limited to 49 CFR § 179.15.

285.    Defendants' violation of such safety laws and regulations constitutes negligence *per se*.

286.    Additionally, the FRSA authorizes railroads such as Defendants to adopt and enforce "additional or more stringent requirements not inconsistent with" the regulations.  Upon information and belief, Defendants did in fact adopt a comprehensive set of operating rules which apply to their operations, and Defendants violated their own Operating Rule 140 regarding train inspections.

287.    As a direct and proximate result of Defendants' negligent use, emission, discharge, disposal, distribution and release of hazardous materials throughout a 30-mile radius surrounding the derailment site, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

288.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

289.    Plaintiffs' damages include the need for remediation and continued, periodic testing of

their livestock and/or pets to ensure early detection of any disease or illness in the animals as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

290. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT I(B)

## NEGLIGENCE

## (On Behalf of All Plaintiffs Against General American Marks Company and GATX)

291. As railcar owners, General American Marks Company and GATX are responsible for inspecting, maintaining, and delivering a railcar for service in a safe condition.

292. As railcar owners responsible for the maintenance of Car 23, General American Marks Company and GATX Corporation, were responsible for ensuring that Car 23 moved at least one car length every six months.

293. However, upon information and belief, GATX and General American Marks Company breached their duty to exercise reasonable care, and were thereby negligent, in one or more of the following respects:

    a.    By allowing Car 23 to be used in rail service with a defective wheel bearing;

    b.    By allowing Car 23 to be used in rail service without properly inspecting the wheel bearing;

    c.    By allowing Car 23 to be used in rail service without properly maintaining the wheel bearing; and

    d.    By allowing Car 23 to be stationary for long periods of time, in excess of six months, without inspecting, maintaining or replacing the wheel bearing.

294. As a direct and proximate result of one or more of the aforesaid negligent acts of General American Marks Company and GATX, in combination with the acts and omissions of the Railroad

Defendants as set forth herein, the wheel bearing on Car 23 overheated and failed, causing multiple other railcars to derail, which proximately caused or contributed to the release of hazardous materials, including vinyl chloride, between February 3-6, 2023.

295.   As a direct and proximate result of Defendants General American Marks Company and GATX's negligence, in combination with the acts and omissions of the Railroad Defendants as set forth herein, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

296.   Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

297.   Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animals as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to

volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

General American Marks Company and GATX's conduct as alleged herein shows that they acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**COUNT I(C)**

**NEGLIGENCE**

**(On Behalf of All Plaintiffs Against Oxy Vinyls, GATX, and TILC)**

298.    As railcar owners and the shippers of materials, including hazardous materials, using the rails, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars that are approved for use under applicable federal regulations and industry standards including, but not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

299.    As railcar owners and the shippers of materials, including hazardous materials, using the rails, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars that are certified for use under applicable federal regulations and industry standards including, but not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

300.    As railcar owners and the shippers of materials, including hazardous materials, using the rails, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars that are constructed, repaired, replaced or maintained consistent with their approvals and certifications for use under applicable federal regulations and industry standards including, but not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

301.    As railcar owners and the shippers of materials, including hazardous materials, using the rails, Oxy Vinyls, GATX, and TILC are each responsible for using only those railcars that are compatible with the lading or goods to be transported within them under applicable federal regulations and industry standards including, but not limited to, 49 C.F.R. §§ 180.501, 180.507, 180.590 and 180.517.

302.    Despite these requirements under federal regulations and applicable industry standards, Cars 26, 27, 28, 29 and 53 – all of which were owned, leased and/or used by Oxy Vinyls, GATX, and TILC – were either unapproved, uncertified or incompatible for use with vinyl chloride in at least the following respects, in violation of federal regulations:

    a.    Car 26 was physically constructed and/or in a physical state that was inconsistent with its approved certificate of construction;

    b.    Car 27 was fitted with modifications that were not part of its approved certificate of construction;

    c.    Cars 27, 28 and 53 were each accompanied by defective and/or incomplete

certificates of construction;

    d.    Cars 26, 27, 28 and 53 were each constructed with aluminum in their pressure relief devices ("PRD"), PRD protective housings, handwheels and angle handwheels; and

    e.    Car 29 was fitted with an unapproved pressure relief device ("PRD") and was not specially approved for use with vinyl chloride.

303.    Oxy Vinyls, GATX and TILC's collective and individual failures to ensure these Cars were approved, certified and/or compatible with the use of vinyl chloride constitutes negligence and/or a breach of duties established in the federal regulations cited herein, as well as the obligation imposed by the American Association of Railroads rules and standards authorized by federal regulations, which, in combination with the acts and omissions of the Railroad Defendants as set forth herein, directly and proximately caused or contributed to the release of hazardous materials, including vinyl chloride, between February 3-6, 2023.

304.    As a direct and proximate result of Defendants Oxy Vinyls, GATX, and TILC's negligence, in combination with the acts and omissions of the Railroad Defendants as set forth herein, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, loss of use and enjoyment, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

305.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

306.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animals as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as

alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

307.    Oxy Vinyls, GATX and TILC's conduct as alleged herein shows that they acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT II

### STRICT LIABILITY

#### (On Behalf of All Plaintiffs Against the Railroad Defendants)

308.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

309.    Defendants are strictly liable for the injuries and damages suffered by Plaintiffs to the provisions of the Restatement (Second) of Torts §§ 519 and 520.

310.    The transportation of the toxic and flammable substance vinyl chloride is an abnormally dangerous and/or ultrahazardous activity under the definition set forth in Restatement (Second) of Torts §§ 519 and 520.

311.    The Defendants engaged in an abnormally dangerous and/or ultrahazardous activity by transporting hazardous substances, including but not limited to vinyl chloride, through a residential community, making them strictly liable for any resulting damages.

312.    The Defendants also engaged in an abnormally dangerous and/or ultrahazardous activity when they dumped the vinyl chloride they were transporting and lit it on fire in a residential community, making them strictly liable for any resulting damages.

313.    As a direct and proximate result of the Defendants' abnormally dangerous and/or ultrahazardous activity, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

314.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

315.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

316.    Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiffs, which were a direct and proximate result of the train derailment and release of hazardous substances which harmed Plaintiffs as described above.

317.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT III

## STATUTORY NUISANCE (OHIO)

### (On Behalf of the Ohio Residents and Property Owners Against the Railroad Defendants)

318.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

319.    Ohio R.C. § 3704.05 states "no person shall cause, permit, or allow emission of an air contaminant in violation of any rule adopted by the director of environmental protection."

320.    Ohio Admin. Code 3745-15-07(A) states "[t]he emission or escape into the open air for any source or sources whatsoever of … fumes, gases, vapors, or any other substance or combinations of substances, in such manner or in such amounts as to endanger the health, safety or welfare of the public, or cause unreasonable injury or damage to property, is hereby found and declared to be a public nuisance.

It shall be unlawful for any person to cause, permit or maintain any such public nuisance."

321.    As a result of the derailment and subsequent fire and toxic chemical burn, Defendants emitted impermissible amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

322.    Ohio R.C. § 3746.06 requires that, when contaminated property is voluntarily cleaned up, the remedial activities undertaken must ensure the groundwater complies with standards for residential use.

323.    As a result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs have been exposed to hazardous air pollutants in violation of Ohio law.

324.    As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, these toxins continuously invaded and contaminated the areas surrounding Plaintiffs, thereby exposing their properties and bodies to unsafe levels of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

325.    As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, and the exposure to these toxins resulting therefrom, Plaintiffs presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and have the present need for medical monitoring to ensure early detection of any such disease or illness.

326.    Plaintiffs' damages include the need for remediation and continued, periodic testing of

their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

327. Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

328. Plaintiffs suffered injuries that are distinct from the injuries suffered by the public at large.

329. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**COUNT IV**

**STATUTORY NUISANCE (PENNSYLVANIA)**

**(On Behalf of The Pennsylvania Residents, Property Owners, and Employees, Against the Railroad Defendants)**

330. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

331. Under the Pennsylvania Air Pollution Control Act, 35 P.S. § 4006.6, it is impermissible to emit air pollutants of hazardous materials in amounts greater than those set by the Clean Air Act.

332. Section 112 of the Clean Air Act includes vinyl chloride in the list of hazardous air pollutants and sets a national emission standard. 41 Fed. Reg. 46560 (1976).

333. 35 P.S. § 4013 declares that any violation of the Air Pollution Control Act "shall constitute a public nuisance," and "[a]ny person who causes the public nuisance shall be liable for the cost of abatement."

334. As a result of the derailment and subsequent fire and toxic chemical burn, Defendants

emitted impermissible amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

335.    As a result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs have been exposed to hazardous air pollutants in violation of Pennsylvania law.

336.    As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, these toxins continuously invaded and contaminated the areas surrounding Plaintiffs, thereby exposing their properties and body to unsafe levels of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene.

337.    As a direct and proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, and the exposure to these toxins resulting therefrom, Plaintiffs presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

338.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

339.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the

contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

340. Plaintiffs suffered injuries that are distinct from the injuries suffered by the public at large.

341. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT V

## PRIVATE NUISANCE

### (On Behalf of All Plaintiffs Against the Railroad Defendants)

342. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

343. At all times relevant hereto, Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene were hazardous and harmful to real property and human beings, and it was substantially certain that improper transportation, handling, and disposal of these materials would cause injury to Plaintiffs and the and their property.

344. Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated real property located in the 30-mile radius surrounding the East Palestine derailment site.

345. Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have released vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene onto Plaintiffs' land and have contaminated Plaintiffs' real property, water and persons.

346. The Defendants' contamination of Plaintiffs' property with vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene has unreasonably interfered with the rights of Plaintiffs to use and

enjoy their property, causing them to suffer injuries different in kind and degree from others in surrounding areas. Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs to, among other things, refrain from occupying or using their real properties, using contaminated water to drink, cook, bathe, irrigate farmland and gardens, eat from home gardens, or water pets and livestock. This has, in turn, caused significant loss of income, out of pocket expenses, loss of use and enjoyment and inconvenience.

347.    Defendants' conduct has also substantially interfered with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that they so choose. It has also reduced the value of their land.

348.    Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs.

349.    Plaintiffs, unlike the public generally, have suffered specific injuries as a result of Defendants' tortious, illegal, and wrongful conduct, including the pollution of their land and water.

350.    Defendants' improper transportation, handling, and disposal of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene and the contamination of Plaintiffs' property resulting therefrom, constitutes a private nuisance. This nuisance has directly and proximately caused Plaintiffs to presently suffer, and continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

351.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

352.     Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

353.     Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT VI

## PUBLIC NUISANCE

### (On Behalf of All Plaintiffs Against the Railroad Defendants)

354.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

355.     At all times relevant hereto, Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids were hazardous and harmful to real property and human beings, and it was substantially certain that improper transportation, handling, and disposing of these materials was hazardous and harmful to people living in nearby areas.

356.     Plaintiffs have a common right to enjoy their real property free of dangerous contamination, to breathe clean air and have access to clean running and groundwater without dangerous levels of toxic chemicals, and to live life without unreasonable exposure to toxic chemicals.

357.     Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids substantially and unreasonably infringed upon and transgressed these public rights.

358.     As a proximate result of Defendants' improper transportation, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Plaintiffs, and the general public's common right to breathe clean air and have access to clean running water without dangerous levels of toxic and harmful chemicals was severely diminished, if not eliminated.

359.     As a proximate result of Defendants' improper transportation, handling, and disposal of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Defendants invaded and contaminated the areas surrounding Plaintiffs' residences, thereby exposing them to toxic chemicals and carcinogens.

360.     Each of the Plaintiffs suffered injuries that are distinct from the public at large because their individual real and personal property rights have been unreasonably interfered with.

361.     As a direct and proximate result of Defendants' creation of a public nuisance and the public's exposure to toxic chemicals resulting therefrom, Plaintiff presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for annoyance, upset, aggravation and inconvenience, increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

362.     Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

363.     Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

364.     Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT VII

## TRESPASS

63

**(On Behalf of The Residents and Property Owners Against the Railroad Defendants)**

365. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

366. At all times relevant hereto, Defendants knew or should have known vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride to be hazardous and harmful to real property, animals, and human beings, and it was substantially certain that their use, emission, discharge, disposal, distribution, spreading and/or release of these hazardous materials would cause injury to Plaintiffs and their property.

367. Defendants, through their activities alleged herein, caused hazardous materials to enter and contaminate Plaintiffs' property. They intentionally, knowingly, and negligently used, discharged, spread, deposited and/or released these hazardous materials knowing that those toxins would contaminate the real property and drinking water of individuals like Plaintiffs.

368. Defendants, through their activities alleged herein, authorized, requested, or caused others to dispose of waste in a manner which they knew was substantially likely to cause hazardous materials, including vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride and/or other combustible liquids to enter and contaminate Plaintiffs' properties. Through their actions in intentionally causing others to spread their waste, they intentionally, knowingly, and negligently caused hazardous materials to enter Plaintiffs' land and water.

369. At all relevant times Defendants were aware that their conduct in disposing of vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride, and other combustible liquids was contrary to Plaintiffs' rights in their property.

370. At all times, Defendants' conduct displayed indifference to and disregard for Plaintiffs' rights to their property.

371. Defendants, through their activities regarding hazardous materials alleged herein, failed to act in the manner of an ordinary, careful person or business.

372. The Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' real and personal property with hazardous materials has interfered with the

rights of Plaintiffs to use and enjoy their property and constitutes trespass and continuing trespass. Defendants' trespass has substantially impaired Plaintiffs' rights in the use and enjoyment of their property as well as economic and property damages as alleged herein.

373. Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

374. Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

375. Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

376. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**COUNT VIII**

**TRESPASS TO CHATTELS**

**(On Behalf of The Residents and Property Owners Against the Railroad Defendants)**

377. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

378. At all relevant times, Plaintiffs had a possessory interest in all their personal property, including but not limited to personal vehicles, commercial vehicles, household goods, food, professional

equipment, recreational equipment, livestock, and pets.

379. Defendants, through their activities alleged herein, caused the impairment of Plaintiffs' property as to its condition, quality, or value and harmed Plaintiffs' materially valuable interest in the same.

380. Defendants, through their activities alleged herein, deprived Plaintiffs of the possession or use of their chattel for a substantial time.

381. Defendants, through their activities alleged herein, caused harm to property in which Plaintiffs had or have a legally protected interest.

382. At all relevant times Defendants were aware that their conduct in transporting, handling, and disposing of vinyl chloride, butyl acrylate, benzene residue, and combustion byproducts including, but not limited to, volatiles, semi-volatiles, dioxins, and phosgene was contrary to Plaintiffs' legally protected interest in their personal property.

383. The Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' personal property substantially impaired Plaintiffs' legally protected interest in their property as well as economic and property damages as alleged herein.

384. Defendants' trespass has also interfered with and continues to interfere with Plaintiffs' ability to enjoy their personal property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that Plaintiffs so choose.

385. Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs personal property damage, out of pocket expense, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience. These damages include, but are not limited to, the contamination and/or death of livestock and pets, and the contamination of personal vehicles, commercial vehicles, household goods, food, professional equipment, and recreational equipment.

386. Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested

to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

387.    Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, and combustion byproducts including, but not limited to, volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

388.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT IX

## DESTRUCTION OF VINES, BUSHES, TREES, AND CROPS OHIO R.C. § 901.51

### (On Behalf of the Ohio Residents and Property Owners Against the Railroad Defendants)

389.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

390.    At all relevant times, Plaintiffs engaged in growing or standing vines, bushes, shrubs, saplings, trees, or crops on real property, owned, leased or otherwise occupied by Plaintiffs.

391.    Defendants, through their activities alleged herein, damaged Plaintiffs' vines, bushes, and/or trees by the entry and intrusion of hazardous materials to Plaintiffs' property and were without any applicable privilege or permission for such entry.

392.    At all relevant times, Defendants' conduct displayed indifference to and disregard for the Plaintiffs' rights to their land.

393.    At all relevant times, Defendants' conduct as alleged herein was done with a conscious disregard or indifference to the substantial and unjustifiable risk of harm to Plaintiffs' property by the entry and/or exposure to the hazardous materials.

394.    As a direct and proximate result of the Defendants' abnormally dangerous and/or ultrahazardous activity, Plaintiffs presently suffer, and will continue to suffer in the future, damage to

vines, bushes, shrubs, saplings, trees, and/or crops standing or growing on the land, owned, leased or otherwise occupied by Plaintiffs.

395.    Plaintiffs' injuries also include real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

396.    In addition, Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

397.    Pursuant to O.R.C. § 901.51, Plaintiffs are entitled to treble damages for the injuries caused and alleged herein, as well as any other damages, including punitive damages.

398.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT X

## AGRICULTURAL CROP DESTRUCTION

## 42 Pa.C.S.A. § 8313

**(On Behalf of the Pennsylvania Residents and Property Owners Against the Railroad Defendants)**

399.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

400.    At all relevant times, Plaintiffs engaged in raising field crops, vegetables or fruit plants, or trees for scientific or commercial purposes, or for testing or research purposes in connection to a public or private research facility or university or governmental agency.

401.    Defendants, through their activities alleged herein, damaged Plaintiffs' field crops, vegetables or fruit plants, and/or trees and such damage was not the result of research or normal commercial activities.

68

402.    Plaintiffs' field crops, vegetables or fruit plants and/or trees were damaged when exposed to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and proximate result of Defendants' negligent, reckless, ultrahazardous, and willful and wanton conduct as alleged herein.

403.    Plaintiffs' injuries also include real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

404.    Pursuant to 42 Pa. C.S.A. §8313, Plaintiffs are entitled to all appropriate relief, including compensatory and punitive damages, reasonable investigative expenses, reasonable attorney fees, and other costs associated with the litigation.

405.    Plaintiffs shall be entitled to damages treble the market value of the field crops, vegetable or fruit plants or trees prior to damage, in addition to actual damages related to the production, research, testing, replacement and crop development costs directly related to the crop that has been damaged as part of the value of the crop, as well as damage to any records, data and data-gathering equipment or devices.

406.    In addition, Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

407.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT XI

## DESTRUCTION OF TIMBER, TREES, LOGS, POSTS, FRUITS, NUTS, GROWING PLANTS OR PRODUCTS OF SAID PLANTS

### W.Va. Code § 61-3-48a

**(On Behalf of the West Virginia Residents and Property Owners Against the Railroad Defendants)**

408.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

409.    At all relevant times, Plaintiffs engaged in growing timber, trees, logs, posts, fruits, nuts, growing plants and/or products of growing plants.

410.    Defendants, through their activities alleged herein, damaged or caused damage to occur to Plaintiffs' timber, trees, logs, posts, fruits, nuts, growing plants and/or products of growing plants.

411.    At all relevant times, the Defendants did not have written permission for the forced entry onto land owned, leased, or otherwise occupied, by Plaintiffs where the damage occurred.

412.    Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all the damages to Plaintiffs, which were a direct and proximate result of the train derailment and release of hazardous substances and ensuing clean-up activities, resulting in the harm to Plaintiffs.

413.    Plaintiffs' injuries include real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, and inconvenience.

414.    In addition, Plaintiffs' damages also include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops.  Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

415.    Pursuant to W.Va. Code §61-3-48a, Plaintiffs are entitled to treble damages; an amount three times the value of the timber, trees, growing plants or products thereof, in addition to and distinct from any other penalties provide by law, including punitive damages.

416.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT XII INJURING ANIMALS Ohio R.C. § 959.02

### (On Behalf of the Ohio Residents and Property Owners Against the Railroad Defendants)

417.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted within this Complaint as if fully set forth herein.

418.     Ohio Rev. Code § 959.02 prohibits anyone from "maliciously, or willfully, and without the consent of the owner" killing or injuring "a horse, mare, foal, filly, jack, mule, sheep, goat, cow, steer, bull, heifer, ass, ox, swine, dog, cat, or other domestic animal that is the property of another."

419.     Per Ohio Rev. Code § 2307.60(A)(1), "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action and attorney's fees [if authorized] and may recover punitive or exemplary damages [if authorized]."

420.     As a direct and proximate result of Defendants' conduct and activities as alleged herein, Plaintiffs' animals have been injured and will continue to suffer injury in the future.

421.     Accordingly, Plaintiffs presently suffer, and will continue suffering in the future, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, annoyance, upset, aggravation, and inconvenience.

422.     Plaintiffs' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

423.     Plaintiffs' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animal as a result of the contamination and exposure to vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene they experienced as a result of Defendants' activities alleged herein.

424.     Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded

71

Plaintiffs' rights so as to warrant the imposition of punitive or exemplary damages.

**COUNT XIII**

**MEDICAL MONITORING**

**(On Behalf of the Ohio Residents Against All Defendants)**[12]

425.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

426.    Plaintiffs have been exposed to significant amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that have been proven to cause cancer and other diseases in humans.

427.    The hazardous materials carried by the train and released by Defendants are highly toxic substances.

428.    As a proximate result of their exposure to these toxic substances, vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs have a significantly increased risk of developing diseases and cancer, including but not limited to liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's disease and acro-osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

429.    This increased risk would warrant a reasonable physician to order monitoring.

430.    Early diagnosis of these diseases and cancers has significant value for Plaintiffs because such diagnoses will help them monitor and minimize the harm therefrom.

431.    Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs'

---

[12]Plaintiffs acknowledge that under Ohio law, medical monitoring might not be recognized as a stand-along cause of action. Accordingly, Plaintiffs allege it here as both a cause of action and an element of damages available under other applicable causes of action.

exposures to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a result of Defendants' actions as alleged herein.

432.     As a direct and proximate result of Plaintiffs' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

433.     As a result, Plaintiffs should be awarded the quantifiable costs of such a monitoring regime.

**COUNT XIV**

**MEDICAL MONITORING**

**(On Behalf of the Pennsylvania Residents Against All Defendants)**

434.     Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

435.     Plaintiffs have been exposed to significant amounts of vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that have been proven to cause cancer and other diseases in humans.

436.     The hazardous materials carried by the train and released by Defendants are highly toxic substances.

437.     Plaintiffs were exposed to these toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and proximate result of Defendants' tortious actions, including Defendants' negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

438.     As a direct and proximate result of their exposure to these toxic substances, vinyl chloride,

butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs have a significantly increased risk of developing diseases and cancer, including but not limited to liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's disease and acro- osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

439.    This increased risk would warrant a reasonable physician to order monitoring.

440.    Early diagnosis of these diseases and cancers has significant value for Plaintiffs because such diagnoses will help them monitor and minimize the harm therefrom.

441.    Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs' exposures to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a result of Defendants' actions as alleged herein.

442.    As a direct and proximate result of Plaintiffs' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

443.    As a result, Plaintiffs should be awarded the quantifiable costs of such a monitoring regime.

## COUNT XV

## MEDICAL MONITORING

### (On Behalf of the West Virginia Residents Against All Defendants)

444.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

445.    Plaintiffs have been exposed to significant amounts of vinyl chloride, butyl acrylate,

benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that have been proven to cause cancer and other diseases in humans.

446.    The hazardous materials carried by the train and released by Defendants are highly toxic substances.

447.    Plaintiffs were exposed to these toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a direct and proximate result of Defendants' tortious actions, including Defendants' negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

448.    As a direct and proximate result of their exposure to these toxic substances, vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, Plaintiffs have a significantly increased risk of developing diseases and cancer, including but not limited to liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's disease and acro-osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

449.    This increased risk would warrant a reasonable physician to order monitoring.

450.    Early diagnosis of these diseases and cancers has significant value for Plaintiffs because such diagnoses will help them monitor and minimize the harm therefrom.

451.    Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different from those normally recommended in the absence of toxic exposures and are reasonably necessary as a direct and proximate result of Plaintiffs' exposure to the toxic substances, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, as a result of Defendants' actions as alleged herein.

452.    As a direct and proximate result of Plaintiffs' exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary,

because such surveillance will provide early detection and diagnosis of harmful and debilitating injuries potentially resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

453. As a result, Plaintiffs should be awarded the quantifiable costs of such a monitoring regime.

## COUNT XVI

## SPOLIATION

### (On Behalf of All Plaintiffs Against the Railroad Defendants)

454. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

455. Under the common law of Ohio as well as the Federal Rules of Civil Procedure, the Defendants were required to preserve any and all evidence relating to the train derailment and subsequent toxic explosion once they reasonably anticipated that litigation would ensue.

456. Under the common law of Ohio, as well as the Federal Rules of Civil Procedure, this duty to preserve evidence not only required the Defendants to refrain from affirmatively destroying physical evidence, documents, and other materials, but also required the Defendants to suspend any automatic processes that would result in the same.

457. The Defendants reasonably anticipated, or should have reasonably anticipated, litigation concerning the train derailment and subsequent toxic explosion as of February 3, 2023, immediately after Train 32N derailed.

458. However, despite reasonably anticipating litigation, the Defendants did not act timely or reasonably to suspend automatic processes that would result in the destruction of case- critical evidence.

459. Specifically, according to the NTSB, the Defendants failed to suspend the processes whereby the full surveillance video from the cab of Train 32N would be preserved, instead placing Train 32N back into service such that automatic processes in the video recording system deleted and recorded over this case-critical evidence.[13]

---

[13]Rowland, Darrel, "Most of Norfolk Southern video leading up to East Palestine derailment is gone" March 26,

460. According to the NTSB, the full surveillance video from the cab of Train 32N is "just as important" as those limited portions the Defendants selected to preserve before allowing the rest of the surveillance footage to be automatically deleted and overwritten.[14]

461. Indeed, the NTSB explained that because the Defendants allowed the full surveillance video from the cab of Train 32N to be deleted, "we don't even have what was occurring around the first and second wayside (defect) detectors, much less before that, **all of which is key to investigations**."[15]

462. As a result of the destruction of this video surveillance footage from the cab of Train 32N – and other acts or omissions which may be revealed throughout the course of investigation and discovery – Defendants have willfully destroyed or interfered with evidence that disrupts Plaintiffs' ability to prosecute their claims.

463. Accordingly, Plaintiffs should be awarded damages commensurate with Defendants' spoliation of evidence in an amount to be determined at trial, together with any other appropriate remedies.

## COUNT XVII

## GROSS NEGLIGENCE/WILLFUL AND WANTON CONDUCT

### (On Behalf of All Plaintiffs Against All Defendants)

464. Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

465. At all times relevant, Defendants owed a duty to refrain from grossly negligent, willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs.

466. Upon information and belief, Defendants were, at all times relevant, aware that vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride are highly carcinogenic, mutagenic and/or otherwise harmful to humans.

467. Upon information and belief, Defendants were, at all times relevant, aware of the

---

2023 (last accessed March 27, 2023).

[14]*Id.*

[15]*Id.*

considerable health risks associated with the release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride into the air, water, and land, including the risk of causing various diseases and cancers in the surrounding population.

468.    Upon information and belief, Defendants were, at all times relevant, aware that their transportation and release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride could result in the unreasonably dangerous emission of hazardous materials into the surrounding communities.

469.    Upon information and belief, Defendants were, at all times relevant, aware that at least one railcar was malfunctioning for at least 20 miles before the derailment occurred.

470.    Notwithstanding this actual knowledge, and inconsistent with federal regulations and industry practice and procedures, Defendants breached their duties by, among other things:

    a.    Failing to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible or hazardous liquids;

    b.    Failing to utilize appropriate and available technology such as "wayside defect detectors" or "hot bearing detectors"; failing to appropriately place such detectors to ensure timely alerting of any potential problems; failing to implement appropriate policies for the use of such detectors including, but not limited to, setting appropriate alarm thresholds and criteria for determining when a potentially dangerous condition exists; and failing to ensure that such detectors are timely and properly inspected and maintained;

    c.    Failing to ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

    d.    Failing to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

e.   Failing to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

f.   Failing to prevent over-loading the train with too many railcars or materials;

g.   Failing to load the railcars consistent with accepted practice;

h.   Failing to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

i.   Failing to adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

j.   Failing to adequately hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of Train 32N on February 3, 2023;

k.   Failing to adequately train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of Train 32N and issues that arose on February 3, 2023;

l.   Failing to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of Train 32N on February 3, 2023;

m.   Failing to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

n.   Failing to properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

o.   Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

p.   Failing to adequately warn those in danger of exposure to hazardous chemicals;

79

q.     Failing to institute proper procedures and training for response to the mechanical malfunction of a rail car;

r.     Failing to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

s.     Failing to institute proper procedures to avoid exposing hazardous materials to the environment;

t.     Failing to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

u.     Failing to timely implement such an emergency response plan;

v.     Failing to transport and handle hazardous materials in a manner which would not cause Plaintiffs injury or harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct;

w.     Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiff and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

x.     Failing to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

y.     Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

z.     Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, to persons at risk of exposure, including those outside the evacuation zone;

aa.     Accurately make known the risk of exposure faced by those persons at risk of

exposure, including those outside the evacuation zone;

bb.     Failing to contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene, into the surrounding air, water, real property, and persons in order to avoid injury to;

cc.     Failing to otherwise reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, other contaminants as alleged, and byproducts including but not limited to volatiles, semi-volatiles, dioxins, and phosgene; and

dd.     Otherwise unreasonably causing injury to Plaintiffs in ways further investigation and discovery will reveal.

ee.     With respect to Defendants General American Marks Company and GATX, by allowing Car 23 to be used in rail service with a defective wheel bearing; by allowing Car 23 to be used in rail service without properly inspecting the wheel bearing; by allowing Car 23 to be used in rail service without properly maintaining the wheel bearing, and by allowing Car 23 to be stationary for long periods of time, in excess of six months, without inspecting, maintaining, or replacing the wheel bearings.

ff.     With respect to Defendants Oxy Vinyls, GATX, and TILC, by using or allowing to be used Cars 26, 27, 28, 29, and 53 for the transportation of vinyl chloride in violation of federal regulations as follows:  (1) Car 26 was physically constructed and/or in a physical state that was inconsistent with its approved certificate of construction; (2) Car 27 was fitted with modifications that were not part of its approved certificate of construction; (3) Cars 27, 28 and 53 were each accompanied by defective and/or incomplete certificates of construction;  (4) Cars 26, 27, 28 and 53 were each constructed with aluminum in their pressure relief devices ("PRD"), PRD protective housings, handwheels and angle handwheels; and (5) Car 29 was fitted with an

unapproved pressure relief device ("PRD") and was not specially approved for use with vinyl chloride.

471. Defendants' failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable hazardous material discharge constitute gross negligence, willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs so as to warrant the imposition of punitive or exemplary damages.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, including jointly and severally as warranted, as follows:

a. For damages, including compensatory, punitive, and exemplary damages, in an amount determined just and reasonable;

b. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

c. For prejudgment and post-judgment interest on all amounts awarded;

d. For injunctive and declaratory relief, as allowed by law, including medical monitoring; and

e. Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: March 8, 2024          Respectfully submitted,

*/s/ Christopher M. Frasor*
Christopher M. Frasor, Esq.
**FRASOR IRELAND, LLP**
306 Industrial Parkway, Suite A
Bowling Green, Ohio 43402
Telephone: (419) 806-4026
cfrasor@frasorireland.com

*/s/ Jeffrey L. Haberman*
Jeffrey L. Haberman, Esq. (*pro hac vice*)

**SCHLESINGER LAW OFFICES, P.A.**
1212 SE Third Avenue,
Fort Lauderdale, FL 33316
Telephone: (954) 467-8800
jhaberman@schlesingerlaw.com

*Attorneys for Plaintiffs*